Filed 2/24/21  P. v. Jabbar CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KENNETH JABBAR,<br><br>    Defendant and Appellant. | D076843<br><br><br>(Super. Ct. No. SCD279217) |

APPEAL from a judgment of the Superior Court of San Diego County, Maureen F. Hallahan, Judge.  Affirmed.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Paige B. Hazard and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Kenneth Jabbar guilty of one count of assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)),[1] one count of battery with serious bodily injury (§ 243, subd. (d)), and two counts of misdemeanor cruelty to a child (§ 273a, subd. (b)).  For the assault count, the jury found that Jabbar personally inflicted great bodily injury. (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8), 1203.075, subd. (a).)  Jabbar admitted a prior serious felony conviction (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), a prior prison term for a violent felony (§ 667.5, subd. (a)), and two prior strikes (§§ 667, subds. (b)-(i), 1170.12, 668).  The trial court sentenced Jabbar to a total prison term of 8 years plus 25 years to life.

Jabbar contends:  (1) insufficient evidence supports the finding of guilt on the two counts of misdemeanor cruelty to a child (§ 273a, subd. (b)); and (2) the three-year enhancement for personally inflicting great bodily injury must be stricken pursuant to section 1170.1, subdivision (g) because both that enhancement and the enhancement for Jabbar's prior serious felony conviction were imposed based on the fact that Jabbar personally inflicted great bodily injury on the victim in this case.  We conclude that both of Jabbar's arguments lack merit.  Accordingly, we affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

V.L. lived with her teenaged minor children in the living room of a one-bedroom apartment, and C.M. lived in the bedroom.  C.M. was V.L.'s friend and Jabbar's ex-girlfriend.  C.M. and Jabbar had a seven-year old son, who lived in the apartment with C.M.  Jabbar and C.M. were in a dispute over whether Jabbar would be permitted to spend time with his son.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

After midnight on October 21, 2018, Jabbar entered the apartment, looking for his son. V.L. and two of her children were in the living room, while C.M. and her son were in the bedroom behind a closed door. In the living room, Jabbar yelled, "Where is my son? Why are you hiding him from me?" Jabbar then assaulted V.L. while her two children were present. The children yelled and sounded scared as the assault occurred, and a police officer who arrived at the scene shortly afterward noted that the children seemed panicked. V.L. suffered serious injuries to her face, including a broken jaw that required surgery.

Jabbar was charged with one count of assault with intent to commit forcible oral copulation (§ 220, subd. (a)(1)); one count of assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)); one count of battery with serious bodily injury (§ 243, subd. (d)); one count of making a criminal threat (§ 422); one count of first degree residential burglary (§§ 459, 460, subd. (a)); and two counts of misdemeanor cruelty to a child (§ 273a, subd. (b)). For both of the assault counts, it was alleged that Jabbar personally inflicted great bodily injury. (§§ 12022.7, subd. (a), 12022.8, 1192.7, subd. (c)(8), 1203.075, subd. (a).) It was further alleged that Jabbar incurred two prior strikes (§§ 667, subds. (b)-(i), 668,1170.12), one prior serious felony conviction (§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and a prison term for a prior violent felony (§ 667.5, subd. (a)).

Because V.L. did not testify at trial, the evidence about Jabbar's attack on V.L. consisted of C.M.'s testimony describing what she heard while she was in the bedroom, along with evidence about V.L.'s injuries. The People accordingly acknowledged at the close of their case that several of the counts were not supported by sufficient evidence. The People therefore dismissed the counts that alleged assault with intent to commit forcible oral copulation

(§ 220, subd. (a)(1)), making a criminal threat (§ 422), and first degree residential burglary (§§ 459, 460, subd. (a)).

The jury convicted Jabbar on all of the counts that were presented to them: assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), battery with serious bodily injury (§ 243, subd. (d)), and two counts of misdemeanor cruelty to a child (§ 273a, subd. (b)). On the assault count, the jury also made a true finding that Jabbar personally inflicted great bodily injury. (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8), 1203.075, subd. (a).)

Jabbar admitted a prior serious felony conviction (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), a prior prison term for a violent felony (§ 667.5, subd. (a)), and two prior strikes (§§ 667, subds. (b)-(i), 668, 1170.12). The court sentenced Jabbar to a determinate term of eight years and an indeterminate term of 25 years to life. The determinate eight-year term consisted of three years for the great bodily injury enhancement (§ 12022.7, subd. (a)) and five years for the prior serious felony enhancement (§ 667, subd. (a)(1)). For the misdemeanor counts of cruelty to a child, the court sentenced Jabbar to credit for time served.

## II.

## DISCUSSION

A. *Jabbar's Challenge to the Sufficiency of the Evidence to Support the Misdemeanor Convictions for Cruelty to a Child*

We first consider Jabbar's challenge to the sufficiency of the evidence to support the convictions for misdemeanor cruelty to a child. (§ 273a, subd. (b).)

Under the People's theory of the case, as described to the jury during closing argument, Jabbar was guilty of two counts of cruelty to a child because V.L.'s two minor children were in the same room when Jabbar assaulted V.L., causing the children to experience mental suffering. Jabbar

4

contends that because his violent conduct was targeted at V.L., the harm to the children was *indirectly* inflicted. Jabbar argues that, accordingly, he could be guilty of cruelty to the children only if he acted with *criminal negligence* in causing them to experience mental suffering. Jabbar argues that the evidence does not support a finding of criminal negligence because he had no familial relationship to the children, and thus did not owe a duty of care to them.

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . . 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60, citations omitted.) To the extent our sufficiency of the evidence inquiry requires statutory interpretation, we apply a de novo review in conducting that interpretation. (*People v. Prunty* (2015) 62 Cal.4th 59, 71.)

We begin our analysis with an overview of the statutory provision under which Jabbar was convicted. Section 273a, subdivision (b) states, "Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, [1] willfully causes or permits any child to suffer, or [2] inflicts thereon unjustifiable physical pain or mental suffering, or [3] having the care or custody of any child, willfully causes or

5

permits the person or health of that child to be injured, or [4] willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor." (§ 273a, subd. (b), bracketed numbering added.) As our Supreme Court has explained, each of the numbered brackets indicated above describes one of four distinct ways in which the statute can be violated, constituting "essentially four branches of conduct." (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215 (*Sargent*); see also *People v. Valdez* (2002) 27 Cal.4th 778, 783 (*Valdez*).)[2] A violation " ' "can occur in a wide variety of situations: the definition broadly includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect." ' " (*Valdez*, at p. 784.)

Case law has established the mens rea that applies to the four different ways of violating the statute. In *Sargent*, our Supreme Court considered "whether a violation of [former] section 273a[, subdivision] (1) based on direct infliction of unjustifiable physical pain or mental suffering [i.e., the second way of violating the statute] requires proof of general criminal intent or criminal negligence." (*Sargent, supra*, 19 Cal.4th at p. 1219.)[3] *Sargent*

---

[2] *Sargent* and *Valdez* considered the crime of *felony* cruelty to a child, which is currently set forth in subdivision (a) of section 273a. (*Sargent, supra,* 19 Cal.4th at p. 1215; *Valdez, supra*, 27 Cal.4th at p. 783.) The felony provision differs from the misdemeanor provision in subdivision (b) of section 273a primarily in that the felony provision requires that the defendant act "under circumstances or conditions likely to produce great bodily harm or death" (§ 273a, subd. (a)), whereas the misdemeanor provision applies when the defendant acts "under circumstances or conditions *other than* those likely to produce great bodily harm or death." (§ 273a, subd. (b), italics added.)

[3] Former section 273a, subdivision (1), "is substantively identical" to the current section 273a, subdivision (a). (*Sargent, supra,* 19 Cal.4th at p. 1209, fn. 2 [explaining the Legislature's renumbering of the subdivisions of section 273a].)

concluded that "when the conduct at issue involves *the direct infliction* of unjustifiable physical pain or mental suffering on a child, criminal negligence is not an element of the offense.  Rather, the defendant must have a mens rea of general criminal intent to commit the proscribed act." (*Id.* at p. 1224, italics added.)

However, "*Sargent* expressly left open the question of the appropriate mens rea for *indirect* infliction of harm on the child." (*Valdez, supra,* 27 Cal.4th at p. 786, citing *Sargent, supra,* 19 Cal.4th at p. 1216, fn. 5.)  Indirect infliction of harm encompasses acts "such as failing to seek medical treatment, child endangerment, or willfully permitting situations that imperil children." (*Sargent,* at p. 1218; see *Valdez,* at pp. 784-785 [collecting a wide range of cases involving indirect abuse].)

*Valdez* concluded that when indirect infliction of harm is at issue, "criminal negligence is the appropriate standard." (*Valdez, supra,* 27 Cal.4th at p. 781.)  "As construed to contain a criminal negligence requirement, [the statute] sets forth a standard of conduct that is rigorous.  Ordinary negligence will not suffice.  Specifically, criminal negligence involves ' "a higher degree of negligence than is required to establish negligent default on a mere civil issue.  The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . or an indifference to consequences." ' " (*Valdez,* at p. 788.)  The "conduct prohibited by . . . any statute requiring criminal negligence, is not 'accidental[ ],' but a gross departure from the conduct of an ordinarily prudent person." (*Id.* at p. 790.)  " 'Under the criminal negligence standard, knowledge of the risk is determined by an objective test: "[I]f a reasonable

7

person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." ' " (*Id.* at p. 783.)

As one court has summarized the mens rea requirements of section 273a, "[i]n addressing [the statute's] four separate types of conduct, our Supreme Court describes the second category as '*direct* infliction' and the first, third and fourth categories as '*indirect* infliction.' . . . [T]he appropriate mens rea for the second category of direct infliction is general criminal intent, similar to battery or assault with a deadly weapon. . . . [T]he necessary mens rea for the other three categories of indirect infliction is criminal negligence." (*In re L.K.* (2011) 199 Cal.App.4th 1438, 1445, italics added, citations omitted.)

### 1. *Because Jabbar Indirectly Inflicted Harm on the Children, the Appropriate Mens Rea is Criminal Negligence*

Based on the above, the required mens rea in a prosecution for child cruelty under section 273a, subdivision (b) depends on whether the charge involves the direct or indirect infliction of abuse. Jabbar argues that the conduct at issue here involved indirect infliction of abuse and thus requires a finding of criminal negligence. Jabbar supports his argument by quoting *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1441 (*Hamlin*). As *Hamlin* stated, "When a charge of child abuse is based on the mental suffering resulting from a child being exposed to physical abuse by one parent against the other, the theory at issue is *indirect* child abuse, for which criminal negligence is the requisite mental state." (*Ibid.*) In *Hamlin*, a father repeatedly physically assaulted his wife in the presence of their children (*id.* at p. 1440), and he also made disturbing and horrific false statements directly to the children about family sexual abuse. (*Id.* at p. 1443.) In the course of deciding a statute of limitations issue, *Hamlin* stated that the defendant

8

*indirectly* inflicted abuse when he assaulted their mother in their presence, but *directly* inflicted abuse when he made the disturbing statements to the children. (*Id.* at pp. 1440-1441.)

To support his contention that a defendant *indirectly* inflicts mental suffering by physically abusing the child's mother when the child is present, Jabbar also relies on *People v. Burton* (2006) 143 Cal.App.4th 447 (*Burton*). In *Burton*, the defendant attacked and slashed the face of his eight-year-old son's mother while the child was nearby, on the other side of an outdoor wall. (*Id.* at p. 451.) The defendant knew the child was present, and the child saw his mother's bloody injuries immediately after the assault. (*Id.* at p. 455.) "The People charged defendant under the first two branches of section 273a, subdivision (b): (1) willfully caused or permitted his . . . son to suffer; and (2) inflicted on his . . . son unjustifiable mental suffering," reflecting either a theory of direct infliction or indirect infliction. (*Id.* at p. 454.) *Burton* concluded that the appropriate legal theory was *indirect* infliction of harm, under which the inquiry was whether the defendant caused the minor to suffer "with a mental state of criminal negligence toward the minor." (*Id.* at pp. 454-455.) This was because "there [was] no suggestion that defendant intended to directly inflict suffering on his . . . son," as the circumstances showed that the son was not the target of the defendant's physical attack. (*Id.* at p. 454.)

The People argue that Jabbar's reliance on *Hamlin* and *Burton* is unpersuasive to establish that Jabbar *indirectly* inflicted harm on the children. As the People read *Burton*, the defendant in that case *indirectly* inflicted harm on the child only because the child was behind a wall and thus did not see the defendant's assault on his mother. The People argue, "[w]hat made the harm in *Burton* indirect was that the child did not witness the

9

attack directly, and only suffered from the consequences of the attack when he later saw what had happened to his mother." Further, the People contend that *Hamlin*'s discussion of whether a defendant directly or indirectly inflicts harm when assaulting the child's mother was dicta, made in the course of a statute of limitations analysis. The People also contend that *Hamlin* is unpersuasive because it relied on an overly broad interpretation of *Burton*.

We reject the People's argument. As we read both *Burton* and *Hamlin*, the determination of whether the defendants in those cases *directly* inflicted harm on a child by assaulting the child's mother did not turn on whether the child viewed the assault while it was occurring. Instead, as *Burton* explains, the inquiry is whether the evidence suggests that defendant intended to inflict suffering *on the child*, or whether, in contrast, the child's mental suffering occurs as a coincidental byproduct of the child's presence during an assault on the child's mother. (*Burton*, *supra*, 143 Cal.App.4th at p. 454 [based on all of the circumstances, "there [was] no suggestion that defendant intended to directly inflict suffering on his . . . son"].) This approach is sound and reasonable. When the defendant's wrongful conduct is not directed at the child, but only at the child's mother, the harm to the child is an *indirect* effect of the defendant's conduct, and criminal negligence is the appropriate mens rea.

2.      *Jabbar Owed a Duty of Care to the Children*

Having concluded that the appropriate mens rea for Jabbar's indirect infliction of harm on the children is criminal negligence, we turn to the second part of Jabbar's argument. According to Jabbar, he should not have been convicted of two counts of misdemeanor cruelty to a child because insufficient evidence supports a finding that he acted with criminal negligence toward the children. Specifically, Jabbar argues that he could not

10

have acted with criminal negligence because he did not owe a duty of care to the children to refrain from causing harm to them.

Jabbar's argument rests on the principle that " 'criminal negligence only arises from a gross violation of an already existing duty of care.' " (*People v. Heitzman* (1994) 9 Cal.4th 189, 207 (*Heitzman*).)  Jabbar argues that "because [he] had no special relationship with [V.L.'s] children, he did not owe a particular duty to the teenagers and could not be convicted of indirect child abuse based on his conduct towards [V.L.]."  He argues that he would have a duty of care to refrain from indirectly inflicting harm on the children only if he had a "familial-like relationship with either child or [V.L.]."  In support of this contention, Jabbar points out that he "could find no cases where indirect child abuse was based on a nonfamilial assault in a child's presence."  He also contends that certain legislative history "demonstrates that indirect child abuse is limited to situations where there is some form of relationship between abuser and child."

" '[T]he "measuring stick" [of duty] is the same in a criminal case as in the law of torts.' "  (*People v. Oliver* (1989) 210 Cal.App.3d 138, 149 (*Oliver*).)[4] "Under general negligence principles . . . a person ordinarily is obligated to

_____

[4]     The requirement of criminal negligence, as opposed to civil negligence, does not impact the question of whether a duty of care exists, but instead "simply clarifies the standard by which to determine whether the duty [of care], *once established*, has been breached."  (*Heitzman, supra*, 9 Cal.4th at p. 208, italics added.)  As we have explained, a breach of duty occurs in the context of criminal negligence when it is " ' "aggravated, culpable, gross, or reckless, that is . . . such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . or an indifference to consequences." ' "  (*Valdez, supra*, 27 Cal.4th at p. 788.)  Jabbar does not challenge whether his breach of a duty of care was " ' "aggravated, culpable, gross, or reckless." ' "  (*Ibid*.)  Instead, he argues that he did not owe any duty of care at all.

exercise due care in his or her own actions so as not to create an unreasonable risk of injury to others, and this legal duty generally is owed to the class of persons who it is reasonably foreseeable may be injured as the result of the actor's conduct." (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 716 (*Lugtu*).) More specifically, the existence of a duty of care "depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability." (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1072 (*Burgess*).) "The existence of a legal duty is a question of law for the court." (*John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1188.)

In the context of the tort of negligent infliction of emotional distress, our Supreme Court has concluded, as a matter of law, that, under certain circumstances, a defendant has a duty of care toward a family member of a person whom the defendant has physically injured. Specifically, the defendant has a duty of care if the plaintiff "(1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (*Thing v. La Chusa* (1989) 48 Cal.3d 644, 667-668 (*Thing*).) The duty of care does not depend on the *defendant's relationship* to the person who experiences emotional distress or the person who has been physically injured, but rather on the *emotionally distressed person's relationship* to the relative who has been physically injured by the defendant. Indeed, as our Supreme Court has explained, the duty of care in such a case arises " 'in the context of physical injury or emotional distress caused by the negligent conduct of a defendant *with whom the plaintiff had*

12

*no preexisting relationship, and to whom the defendant had not previously assumed a duty of care beyond that owed to the public in general.'* . . . In other words, bystander liability is premised upon a defendant's violation of a duty not to negligently cause emotional distress to people who observe conduct which causes harm to another." (*Burgess*, *supra*, 2 Cal.4th at pp. 1072-1073, italics in original.)

We perceive no reason why the applicable principle should be different under section 273a, subdivision (b) when the question is whether a defendant owed a duty of care to the child whom he emotionally harmed by assaulting the child's mother in the child's presence. Just as in the case of the tort of negligent infliction of emotional distress, when a defendant physically assaults a woman in the presence of her child, and the child is aware of the assault, it is reasonably foreseeable that the child will experience mental suffering, giving rise to a duty of care on the part of the defendant toward the child for the purpose of a criminal negligence analysis under section 273a. Just as in the context of civil tort liability, it is immaterial for the purpose of a criminal negligence analysis whether the defendant has a familial relationship with the child. Instead, a defendant's duty of care in such a case arises from the general duty "not to negligently cause emotional distress to people who observe conduct which causes harm to another." (*Burgess, supra,* 2 Cal.4th at p. 1073.)[5]

---

[5] Jabbar contends that a duty of care should arise only when the defendant has a familial relationship to the child or the child's mother because, otherwise, the statute "would apply in every situation where an individual committed a violent crime and someone under 18 years of age . . . happened to be a bystander." According to Jabbar, in the absence of such a rule, we would "open the floodgates" to prosecutions under section 273a. We disagree. As our Supreme Court has made clear in the context of civil tort

13

Jabbar contends that legislative history shows "that indirect child abuse is limited to situations where there is some form of relationship between abuser and child." Specifically, Jabbar cites two legislative history documents from 1996.[6] The documents are two committee reports discussing the Legislature's amendment of section 273a to add subdivision (c), which mandates certain minimum conditions of probation for defendants convicted under section 273a. Among those mandatory conditions is "[s]uccessful completion of no less than one year of a child abuser's treatment counseling program approved by the probation department" (§ 273a, subd. (c)(3)), unless the court waives the condition upon finding it is not in the best interests of justice. (*Id.*, subd. (c)(5).) In explaining the reason for enacting this provision, both committee reports quote a statement by the bill's author that the crime of child abuse is "closely related" to domestic abuse, and that there is a need to "end the violence in the home when the victim of the abuse is a child." (Assem. Com. on Public Safety, Analysis of Assem. Bill 3215 (1995-1996 Reg. Sess.) Apr. 16, 1996, p. 2; Sen. Com. on Criminal Procedure, Analysis of Assem. Bill 3215 (1995-1996 Reg. Sess.) as introduced Feb. 23, 1996, p. 4.) According to Jabbar, because the committee reports refer to domestic situations, they establish that a defendant violates section 273a only if he has a familial relationship to the child. We disagree.

_____

liability, a defendant has a duty of care to refrain from causing emotional harm to a bystander only in specific circumstances, including when the bystander is a close relative of the physically injured person and the bystander is present at the scene of the injury and is aware of it. (*Thing, supra,* 48 Cal.3d at pp. 667-668.) Those requirements, which are clearly satisfied in this case, greatly limit the circumstances in which a defendant will have a duty of care to a minor who is a bystander to a violent crime.

6    We grant Jabbar's request for judicial notice regarding the legislative history materials. (Evid. Code, § 452, subd. (c).)

The legislative history materials explain why the Legislature added the mandatory probation conditions in 1996. However, the documents do not purport to identify the range of criminal conduct that the Legislature had in mind many decades earlier in 1905 when it originally made it a misdemeanor for a defendant to "willfully cause[ ] or permit[ ] any child to suffer" (Stats. 1905, ch. 568, § 5; see also Historical and Statutory Notes, 47G West's Ann. Pen. Code (2014 ed.) foll. § 273a, pp. 110-111), using the same language that still appears in the statute today. (§ 273a, subd. (b).) As our Supreme Court has explained, a violation of the statute " ' " can occur in a wide variety of situations." ' " (*Valdez*, *supra*, 27 Cal.4th at p. 784.) The legislative history materials submitted by Jabbar do not establish otherwise.

Jabbar considers it significant that he "could find no cases where indirect child abuse was based on a nonfamilial assault in a child's presence." Having conducted our own review of the case law, we note that *Burton* and *Hamlin* are the only two published cases that discuss criminal liability under section 273a based on a defendant's assault of a child's mother in the child's presence. Those cases both arose in circumstances where the defendant had a familial relationship with the child and the child's mother. (*Hamlin*, *supra*, 170 Cal.App.4th at p. 1421; *Burton*, *supra*, 143 Cal.App.4th at p. 450.) However, nothing in *Burton* or *Hamlin* suggests that a defendant will escape criminal liability if he does *not* have a familial relationship with the person he assaults or the children who are present. Because of the unfortunate prevalence of domestic violence in our society, there often is a familial relationship when a defendant assaults a parent in the presence of a child. However, there is no reason to limit criminal liability to such a circumstance. A child can be expected to suffer emotional harm by seeing a parent

15

assaulted regardless of whether the child has a familial relationship with the person perpetrating the assault.

In his reply brief, Jabbar cites cases that require the existence of a special relationship before the defendant can be said to have a duty of care. However, those cases are not applicable here because they involve situations where the defendant was alleged to be criminally negligent for *failing to act*, rather than for engaging in *affirmative conduct* that results in harm. For example, in *Heitzman, supra*, 9 Cal.4th 189, our Supreme Court considered the crime of elder abuse set forth in section 368. "Section 368 was patterned on and is virtually identical to section 273a. Cases interpreting one section are therefore appropriately used to interpret the other." (*Valdez, supra*, 27 Cal.4th at p. 785, fn. 4.)[7] *Heitzman* examined the portion of the statute that imposed criminal penalties on a noncaretaker who "willfully . . . *permits*" an elder to suffer harm. (*Heitzman*, at p. 197, italics added.) Specifically, the allegation was that the defendant was guilty based on her "failure to act, i.e., her failure to prevent the infliction of abuse on her father," who was under the care of her brother. (*Ibid*., italics omitted.) *Heitzman* held that "in order for criminal liability to arise for *permitting* an elder to suffer unjustifiable pain or suffering, a defendant must stand in a special relationship to the

---

7    Tracking much of the language of section 273a, subdivision (b), the elder abuse statute states, "A person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions other than those likely to produce great bodily harm or death, *willfully causes or permits any elder or dependent adult to suffer*, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any elder or dependent adult, willfully causes or permits the person or health of the elder or dependent adult to be injured or willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health may be endangered, is guilty of a misdemeanor." (§ 368, subd. (c), italics added.)

individual inflicting the abuse on the elder such that the defendant is under an existing duty to supervise and control that individual's conduct." (*Id.* at p. 212.) Case law has subsequently adopted the same limitation for crimes charged under the identical provision in section 273a, which makes it a crime for a defendant to " 'willfully . . . permit[ ]' " a child to suffer harm. (*People v. Flores* (2016) 2 Cal.App.5th 855, 877 ["that portion of section 273a that imposes criminal penalties on noncaretakers who 'willfully permit[ ]' the requisite injury to be inflicted on a victim is limited to those persons who had an affirmative duty, under statutory or common law principles, to exert control over the actor who caused or directly inflicted the injury on the victim"].)

The special relationship required by *Heitzman* to establish a duty of care is not applicable here because Jabbar was not charged with willfully *permitting* harm to a child through a failure to act. Instead, he was charged with willfully *causing* harm to a child *through his own affirmative actions*. Therefore, Jabbar was not required to have a special relationship with anyone to create a duty of care.[8] Instead, Jabbar's duty of care in this case arises by virtue of the general duty "to exercise due care in his or her own actions so as not to create an unreasonable risk of injury to others." (*Lugtu, supra,* 26 Cal.4th at p. 716.)

---

[8]    In his reply brief, Jabbar also discusses *Oliver, supra,* 210 Cal.App.3d 138 to argue that a duty of care in the context of criminal negligence arises only when a special relationship exists. *Oliver* is inapposite because it concerned the issue of whether the defendant had a duty *to render aid or assistance*, not whether the defendant had a duty of care to refrain from causing harm based on his own affirmative conduct. (*Id.* at p. 147 ["one has no legal duty to rescue or render aid to another in peril, even if the other is in danger of losing his or her life, absent a special relationship which gives rise to such duty"].)

In sum, contrary to Jabbar's contention, he owed a duty of care to the children to refrain from emotionally harming them by assaulting their mother in their presence, regardless of his lack of a familial relationship with the children or V.L. Further, substantial evidence supports a finding that Jabbar acted with criminal negligence in breaching that duty. Jabbar inflicted severe facial injuries on V.L. while her children were located in the same room, and the evidence presented at trial supports a finding that the children became afraid during the assault and panicked. A reasonable trier of fact could find that Jabbar engaged in conduct that was such an " ' "aggravated, culpable, gross, or reckless" ' " departure from what would be the conduct of an ordinarily prudent or careful person under the same circumstances " ' "as to be incompatible with a proper regard for human life . . . or an indifference to consequences." ' " (*Valdez, supra,* 27 Cal.4th at p. 788.)[9]

B.  *Jabbar's Challenge to the Three-Year Enhancement Based on the Finding That He Personally Inflicted Great Bodily Injury in Committing the Assault*

As we have explained, the trial court imposed an eight-year determinate term based on two sentencing enhancements: (1) a three-year enhancement based on the jury's finding that Jabbar personally inflicted great bodily injury in committing the assault (§ 12022.7, subd. (a)), and (2) a five-year enhancement based on Jabbar's conviction for a prior serious felony (§ 667, subd. (a)(1)). Jabbar contends that pursuant to section 1170.1, subdivision (g), the trial court was permitted to impose only one of the

---

[9] The jury was not instructed with the requirement for a conviction under section 273a, subdivision (b) that they find criminal negligence, rather than general intent. However, Jabbar does not contend that the trial court committed reversible error in instructing the jury, and we therefore do not consider the issue.

18

enhancements.  He accordingly asks us to strike the lesser of the two terms (i.e., the three-year term for the personal infliction of great bodily injury during the assault).

Section 1170.1, subdivision (g) provides in relevant part, "When two or more enhancements may be imposed for the infliction of great bodily injury on the same victim in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense.  This subdivision shall not limit the imposition of any other enhancements applicable to that offense . . . ."  (§ 1170.1, subd. (g).)  According to Jabbar, both of the enhancements in this case were imposed based on his personal infliction of great bodily injury on V.L., so that only the greater enhancement may be imposed.

The three-year enhancement under section 12022.7, subdivision (a) was indisputably imposed based on Jabbar's personal infliction of great bodily injury, within the meaning of section 1170.1, subdivision (g), as the enhancement applies when a defendant "personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony."  (§ 12022.7, subd. (a).)  However, Jabbar's contention that the prior serious felony enhancement (§ 667, subd. (a)(1)) was also based on his personal infliction of great bodily injury on V.L. requires closer examination.

Section 667, subdivision (a)(1) provides in pertinent part: "[a]ny person convicted of a serious felony who previously has been convicted of a serious felony . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately."  The definition of "serious felony" in section 667, subdivision (a)(1) is based on the definition in section 1192.7,

19

subdivision (c). (§ 667, subd. (a)(4).) That provision defines " 'serious felony' " to include, inter alia, "any felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice, or any felony in which the defendant personally uses a firearm . . . ." (§ 1192.7, subd. (c)(8).) As Jabbar correctly points out, under this definition, his assault on V.L. qualifies as a serious felony and makes him eligible for the prior serious felony enhancement only because he personally inflicted great bodily injury on V.L. (§ 1192.7, subd. (c).) Jabbar reasons that because he would not have been eligible for the prior serious felony enhancement if he had not inflicted great bodily injury on V.L., the enhancement was "imposed for the infliction of great bodily injury" within the meaning of section 1170.1, subdivision (g).

Jabbar contends that his position is supported by our Supreme Court's opinion in *People v. Rodriguez* (2009) 47 Cal.4th 501. *Rodriguez* dealt with section 1170.1, subdivision (f), which states that a court may not impose more than one enhancement "for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense." (§ 1170.1, subd. (f).) *Rodriguez* held that a defendant's personal use of a firearm during the commission of a felony could not be used to support both a sentence enhancement for personal use of a firearm (§ 12022.5, subd. (a)), and to elevate the punishment for a criminal street gang allegation to a "violent felony" under section 186.22, subdivision (b)(1)(C).[10] This was because the

---

[10] The gang enhancement in section 186.22, subdivision (b)(1) increases to 10 years for "violent" felonies "as defined in subdivision (c) of Section 667.5," or to five years if the felony is a "serious" felony, "as defined in subdivision (c) of Section 1192.7." (§ 186.22, subd. (b)(1).) In *Rodriguez*, the felonies were "violent" under section 667.5, subdivision (c)(8) because the defendant " 'use[d] a firearm . . .' " (*Rodriguez*, *supra*, 47 Cal.4th at p. 505.)

elevation of the gang enhancement depended on a finding that the defendant used a firearm in committing the offense. (*Rodriguez*, at p. 508.)

In *People v. Le* (2015) 61 Cal.4th 416, which Jabbar also cites, our Supreme Court held, as a "logical extension" of *Rodriguez*, that pursuant to section 1170.1, subdivision (f), the court could not impose both a firearm enhancement under section 12022.5, subdivision (a), and an elevated five-year gang enhancement under section 186.22, subdivision (b)(1), when that enhancement was elevated based on the "serious" felony committed by the defendant. (*Id.* at pp. 424, 429.) In *Le*, the felony was "serious" under section 1192.7, subdivision (c) solely because it involved firearm use. (*Id.* at p. 425.) Specifically, the felony qualified as a "serious" felony either "under subdivision (c)(8) of section 1192.7, which applies to 'any felony in which the defendant personally uses a firearm' (*id.,* subd. (c)(8)), or subdivision (c)(23), which applies to 'any felony in which the defendant personally used a dangerous or deadly weapon' (§ 1192.7, subd. (c)(23)), or subdivision (c)(31), which applies to 'assault with a deadly weapon, firearm, machinegun, assault weapon, or semiautomatic firearm.' " (*Le*, at p. 425.)

As Jabbar points out, section 1170.1, subdivision (f), which was at issue in *Rodriguez* and *Le*, and section 1170.1, subdivision (g), which is at issue here, contain similar wording. The statutes differ only in that one statute applies to enhancements based on personal infliction of great bodily injury and the other applies to enhancements based on personal firearm use. Jabbar argues, "The same logic applied by the high court in *Rodriguez* and *Le* applies to the enhancements imposed in [Jabbar's] case. The assault committed by [Jabbar] was not a serious felony on its own. It became one by virtue of the great bodily injury allegation. Because it was a violent felony, it triggered section 667(a) which imposes a five-year enhancement when

21

appellant commits a current serious felony and has a prior conviction of a serious felony. Additionally, the infliction of great bodily injury triggered an enhancement under section 12022.7. As in *Rodriguez*, both enhancements necessarily depended on the same infliction of great bodily injury." Applying the logic of *Rodriguez* and *Le*, Jabbar explains that, "[b]ut for infliction of great bodily injury, [Jabbar's] conduct would not result in a five-year recidivist enhancement. Thus, the only reason the recidivism enhancement can be applied is because of the infliction of serious bodily injury. Section 1170, subdivision (g) does not allow two enhancements based on a single infliction of serious bodily injury."

As Jabbar recognizes, an identical argument was considered and rejected in *People v. Wilson* (2016) 5 Cal.App.5th 561. *Wilson* concluded that, despite *Rodriguez*, section 1170.1, subdivision (g) "does not apply to a recidivist enhancement," such as section 667, subdivision (a)(1), "because such an enhancement does not implicate multiple punishment for a defendant's *act* of inflicting great bodily harm," instead it punishes his *status* as a repeat offender. (*Wilson*, at p. 567, italics added.)

*Wilson* began its analysis by observing that our Supreme Court recognizes a distinction between conduct-based and status-based enhancements—for the purposes of both section 1170.1 and section 654. (*Wilson*, *supra*, 5 Cal.App.5th at p. 566.) With respect to the prohibition on multiple punishment for a single act or omission set forth in section 654, our Supreme Court has held that "prior prison term enhancements are attributable to the defendant's status as a repeat offender [citation]; they are not attributable to the underlying criminal conduct which gave rise to the defendant's prior and current convictions. Because the repeat offender (recidivist) enhancement . . . does not implicate multiple punishment of an

22

act or omission, section 654 is inapplicable." (*People v. Coronado* (1995) 12 Cal.4th 145, 158.)

By examining both the statutory language and the legislative history of section 1170.1, subdivision (g), *Wilson* determined that the same approach with respect to status-based recidivist statutes should apply under section 1170.1, subdivision (g) as under section 654. Turning first to the statutory language, *Wilson* stated, "[s]ection 1170.1, subdivision (g) prevents the imposition of more than one enhancement that is 'for the infliction of great bodily injury on the same victim in the commission of a single offense.' The language 'for the infliction of great bodily injury' indicates that the multiple enhancement restriction is directed to the act (of inflicting great bodily injury) and not the status of the defendant." (*Wilson, supra,* 5 Cal.App.5th at p. 567.)

Turning next to the legislative history, *Wilson* explained that prior to a statutory amendment in 1997 (Stats. 1997, ch. 750, § 3), the relevant subdivision of section 1170.1 prohibited the imposition of multiple enhancements for a single offense. (*Wilson, supra,* 5 Cal.App.5th at p. 568.) The specific enhancements covered by the prohibition were identified by Penal Code provision, and none of them were status-based recidivist enhancements.[11] Legislative history materials showed that the statutory amendment which created section 1170.1, subdivision (g) was made in order to refer generically to enhancements by category " 'to replace laundry lists' " of statutes and "numerous lengthy, confusing, and error-filled lists of various enhancements in the sentencing statutes." (*Wilson,* at p. 569.) *Wilson*

---

[11]  As *Wilson* explained, the statute identified enhancements for use of a weapon (§§ 12022, 12022.4, 12022.5, 12022.55), for inflicting great bodily injury (§ 12022.7), and for injury on a pregnant woman causing termination of the pregnancy (§ 12022.9). (*Wilson, supra,* 5 Cal.App.5th at p. 568.)

therefore concluded that "the Legislature did not intend to include recidivist enhancements within the definition of enhancements that were 'for the infliction of great bodily injury' when it amended subdivision (g) to add the current language. Rather, the Legislature was simplifying a complicated statute by replacing a long list of enhancements with a generic description of them." (*Ibid.*)

Having concluded that section 1170.1, subdivision (g) did not encompass status-based recidivist enhancements, *Wilson* explained that *Rodriguez* was not analogous because "in *Rodriguez* there was no status enhancement that punished Rodriguez for his status rather than his acts." (*Wilson*, *supra*, 5 Cal.App.5th at p. 567.) "Unlike section 667, subdivision (a)(1), [the] section 186.22, subdivision (b)(1)(C) [gang enhancement in *Rodriguez*] imposes an additional punishment on a defendant for his or her conduct *in the present offense*. Section 186.22, subdivision (b)(1) is a conduct enhancement, not a status enhancement." (*Wilson*, at pp. 567-568, italics added.)

We find *Wilson*'s analysis to be persuasive and we follow it here. Section 1170.1, subdivision (g) does not prohibit the imposition of a status-based recidivist statute, such as section 667, subdivision (a)(1), even if the defendant is eligible for that enhancement only because his current offense qualifies as a serious felony due to the personal infliction of great bodily injury.

Jabbar contends that we should conclude that *Wilson*'s analysis is not sound for two reasons. First, Jabbar argues that *Wilson*'s focus on the distinction between status-based recidivist enhancements and conduct-based enhancements is not persuasive because it is merely "semantics" to conclude that a recidivist statute does not punish the defendant for the underlying

24

conduct in the instant prosecution. Jabbar argues that personal infliction of great bodily injury on V.L. is being punished as conduct because he would not otherwise be eligible for the prior serious felony enhancement if he did not engage in the conduct of inflicting great bodily injury. We are not persuaded. *Wilson*'s examination of the statutory language and the legislative history of section 1170.1, subdivision (g) shows that there is more than a semantic distinction between status-based recidivist enhancements and conduct-based enhancements. The point of considering Jabbar's personal infliction of great bodily injury in connection with section 667, subdivision (a)(1) was to identify him as a recidivist who committed *repeated* serious felonies. Although it was necessary to consider the infliction of great bodily injury on V.L. to identify Jabbar as a recidivist, the punishment under section 667, subdivision (a)(1) was imposed based on Jabbar's recidivism, not based on his personal infliction of great bodily injury.

Second, Jabbar takes issue with *Wilson*'s legislative history analysis. According to Jabbar, *Wilson* overlooked that the Legislature *broadened* the scope of enhancements that could be subject to the prohibition on imposing multiple enhancements for a single offense on the same victim. Jabbar argues that the broadening of the statute's scope was accomplished by the technique of using broad generic language when describing the type of enhancement subject to the prohibition. We understand Jabbar's argument, but we do not find it to be persuasive. The fact that the statute was broadened by using generic language does not lessen the force of *Wilson*'s observation that status-based recidivist enhancements were not historically included in the prohibition on multiple enhancements.

## DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:



BENKE, Acting P. J.



AARON, J.